**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DENNIS RODRIGUES, | : | CIVIL CASE NO. |
|     Plaintiff, | : | 3:20-CV-00294(JCH) |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT CONTAINER CORP. | : | MARCH 22, 2022 |
| D/B/A UNICORR PAGKAGING GROUP, | : | |
|     Defendant. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 30)**

**I.     INTRODUCTION**

Plaintiff Dennis Rodrigues ("Rodrigues") brings claims for disability discrimination and retaliation against defendant Connecticut Container Corp., doing business as Unicorr Packaging Group ("Unicorr"). Rodrigues alleges that Unicorr committed the following violations when the company terminated him in 2019: (1) disability discrimination in violation of the Americans with Disabilities Act Amendments Act of 2008, section 12101 of title 42 of the United States Code (the "ADA"); (2) disability discrimination in violation of the Connecticut Fair Employment Practices Act, section 46a-60(b)(1) of the Connecticut General Statutes ("CFEPA"); and (3) retaliation in violation of the Family and Medical Leave Act, section 2615 of title 29 of the United States Code (the "FMLA").

Now before the court is Unicorr's Motion for Summary Judgment, see Unicorr Mot. for Summary J. (Doc. No. 30), which Rodrigues opposes. See Rodrigues Opp'n (Doc. No. 34). For the reasons discussed below, Unicorr's Motion is denied.

## II.     BACKGROUND

### A.     Factual Background

Rodrigues began working at Unicorr, a packaging manufacturer with a plant in North Haven, Connecticut, in 1990. See Rodrigues Local Rule 56(a)2 Statement of Facts at ¶¶ 1,4 (Doc. No. 35) ("Rodrigues SOF"); Unicorr Local Rule 56(a)1 Statement of Facts at ¶¶ 1, 4 (Doc. No. 30-2) ("Unicorr SOF").  Rodrigues has two serious health conditions.  In 2017, he was diagnosed with Crohn's Disease, and he began receiving infusions that required him to be out of work for an afternoon every eight weeks. Rodrigues SOF at ¶¶ 29-30; Unicorr SOF at ¶¶ 29-30.  He also received a diagnosis of benign prostatic hyperplasia ("BPH") at the end of March or beginning of April 2019, which led to two hospitalizations.  Rodrigues SOF at ¶¶ 29, 32; Unicorr SOF at ¶¶ 29, 32.

Over the course of his near thirty years of employment at Unicorr, Rodrigues worked in several roles, but in 2018 and 2019, he served as a Continuous Improvement Lead.  Rodrigues SOF at ¶ 5; Unicorr SOF at ¶ 5.  In 2018, Rodrigues was supervised by Matt Fritzeen ("Fritzeen"), the Plant Manager.  Rodrigues SOF at ¶¶ 8, 10; Unicorr SOF at ¶¶ 8, 10.  Fritzeen consistently gave Rodrigues positive reviews.  See Rodrigues AMF at ¶ 24; 2018 Performance Appraisal (Doc. No. 34-11); 2014 Performance Appraisal (Do. No. 34-8); 2015 Performance Appraisal (Doc. No. 34-9); 2016 Performance Appraisal (Doc. No. 34-10).  These positive reviews were not out of the ordinary for Rodrigues, who never received a negative performance review while he was employed at Unicorr. See Rodrigues Depo. at 17; Perkins Depo. at 41.  At the end of 2018, Fritzeen left Unicorr, and Hap Perkins ("Perkins"), President and Owner of Unicorr, stepped in as acting Plant Manager.  Rodrigues SOF at ¶¶ 9-10; Unicorr SOF

at ¶¶ 8-10.  Perkins felt that the North Haven plant was in need of improvements.  See Perkins Aff. at ¶ 8 (Doc. No. 30-3)  Nonetheless, Perkins approved a five percent raise for Rodrigues, although Fritzeen had initially recommended the raise and Perkins noted in a February 5, 2019 email that he was "not in agreement with these" and "didn't get to give feedback."  Rodrigues SOF at ¶ 12; Unicorr SOF at ¶ 12; Perkins Feb. 5 Email (Doc. No. 30-3 at 8).

Rodrigues' working relationship with Perkins soured when, on February 6, 2019, a co-worker, Bob Clark ("Clark"), accidentally forwarded to Perkins an email chain in which Rodrigues and Clark criticized Perkins.  See Rodrigues SOF at ¶ 13; Unicorr SOF at ¶ 13; Clark and Rodrigues Email Chain (Doc. No. 34-7).  Clark started the email chain while in a management meeting with Perkins.  In the exchange, Clark told Rodrigues that Perkins hadn't "said one good thing since [the meeting] started" and that Perkins "told everyone here he will be the acting [Plant Manager] for a while . . . he feels he is the only one that can fix the problems", adding "OMG."  See Clark and Rodrigues Email Chain.  In response, Rodrigues quipped, "[n]ice . . . it must be like watching [T]rump[']s [S]tate of the [U]nion last night", to which Clark replied, "[j]ust as bad."  Id.  Clark then forwarded the chain to Perkins.  Id.

Thirty minutes after receiving the chain, Perkins forwarded it to Rodrigues along with an email reading merely, "[w]hoops."  Id.  Rodrigues responded with an apology, but added that he stood by his criticism of Perkins, stating, "when you're told every[ ]day that we are no good and we get nothing done and we are too slow it drags us down . . . I have been working very hard to learn and implement improvements in this plant and I feel I did a hell of a job."  Id.  Perkins forwarded the email chain, along with Rodrigues'

3

response, to Karl Ohaus ("Ohaus"), a consultant who advised Unicorr on culture in the North Haven plant, who encouraged Perkins to "work[ ] thru [sic] this bump with Dennis and find[ ] a way to see, learn and act together." See Perkins Feb. 7 Email to Ohaus (Doc. No. 30-5 at pp. 27-28).

The parties disagree as to whether Perkins determined that he would terminate Rodrigues as a result of receiving the email chain. It is undisputed that Perkins terminated Rodrigues' co-worker, Clark, on February 7, one day after seeing the emails, although the parties contest whether Perkins merely accepted Clark's resignation which he had previously tendered. See Rodrigues SOF at ¶ 19; Unicorr SOF at ¶ 19. On the same day, Perkins, Director of Human Resources Kevin Boyle ("Boyle"), and Rodrigues met to allow Rodrigues to defend his position. In the meeting, Rodrigues explained why he sent the email and shared his thoughts on Perkins' management. Rodrigues SOF at ¶ 20; Unicorr SOF at ¶ 20. Perkins replied that the situation was serious. Id. However, Perkins did not terminate Rodrigues on that day. See Rodrigues SOF at ¶¶ 15, 16, 17, 20; Unicorr SOF at ¶¶ 15, 16, 17, 20. While Unicorr contends that Perkins decided to fire Rodrigues after receiving the email and "never wavered from" that intention, see Unicorr SOF at ¶ 16, his deposition testimony and his contemporaneous emails reflect a lack of certainty. See Rodrigues SOF at ¶¶ 15-18; see, e.g., Perkins Feb. 6 Email (Doc. No. 30-5 at 9) ("this could be cause with no severance" for firing Rodrigues); Perkins Feb. 7 Email (Doc. No. 30-5 at 27) ("[s]poke with [Rodrigues], haven't decided . . . ."); Perkins Depo. at 61 (stating that he was he was "pretty well decided" on February 6 but was "maybe trying to figure out why [he] wouldn't" fire Rodrigues); id. at 72 (he "[h]adn't made a final decision, but [his] intent was always to fire [Rodrigues]"). No documents in

4

the record evidence exactly when Perkins' decided to terminate Rodrigues, id. at 73, but Perkins claims that he spoke about his plan in undocumented phone calls and that he "never wavered" in his conviction to terminate Rodrigues. Id. at 73, 76.

After the email chain, Rodrigues continued working for Unicorr, but his relationship with Perkins had changed. See Rodrigues SOF at ¶ 21; Unicorr SOF at ¶ 21. Then, a month later, in March 2019, Rodrigues started experiencing severe symptoms of BPH. See Rodrigues SOF at ¶¶ 15, 16, 17, 20; Unicorr SOF at ¶¶ 15, 16, 17, 20. Suffering from urinary retention that prevented him from going to the bathroom, he was admitted to the emergency room and missed four days of work from Monday, March 18 through Thursday, March 21. Rodrigues SOF at ¶¶ 34; Unicorr SOF at ¶¶ 34; Rodrigues Depo. at 38. Rodrigues emailed Boyle in Human Resources on Sunday, March 17, to inform him that he was in the ER and would be out of work until the following Thursday, following up on March 18 to report that he would hopefully be in on Friday, March 22. Rodrigues SOF at ¶¶ 35-36; Unicorr SOF at ¶¶ 35-36. Boyle failed to respond to either email. Rodrigues SOF at ¶¶ 37; Unicorr SOF at ¶¶ 37. Rodrigues returned to work on Friday, when he informed Boyle that he was having "bladder retention" issues and that he had "had a catheter all week." Rodrigues SOF at ¶¶ 35-36; Unicorr SOF at ¶¶ 35-36; Rodrigues Depo. at 67 (Doc. No. 34-4). For his part, Boyle denies that Rodrigues ever told him why he needed medical leave. See Boyle Depo. at 81-82 (Doc. No. 34-3).

Rodrigues was again out of work in early April 2019, missing Wednesday, April 3 through Friday, April 5 due to prostate issues. Rodrigues SOF at ¶ 38; Unicorr SOF at ¶¶ 38. He again emailed Boyle to inform him that he was seeing a doctor, and Boyle

5

again failed to respond.  Rodrigues SOF at ¶ 39; Unicorr SOF at ¶ 39.  During the course of Rodrigues' medical leaves in March and April of 2019, Boyle forwarded four emails to Perkins regarding Rodrigues' absences, but Perkins and Rodrigues never personally communicated about his prostate illness or absences.  See Rodrigues SOF at ¶ 40-42; Unicorr SOF at ¶ 40-42.  The parties dispute whether Perkins was aware that Rodrigues had prostate issues and whether he knew how much work Rodrigues missed.  See Rodrigues SOF at ¶¶ 45-47; Unicorr SOF at ¶¶ 45-47.  The parties also disagree as to whether Boyle knew that Rodrigues had Crohn's disease for which he required bi-monthly infusions.  See Rodrigues SOF at ¶ 46; Unicorr SOF at ¶ 46.

When Rodrigues returned to work on April 8, he testifies that his nameplate had been removed from his mailbox.  See Rodrigues SOF at ¶ 49; Rodrigues Statement of Additional Material Facts at ¶ 63 ("Rodrigues AMF").  He also contends that Perkins stopped inviting him to meetings, and that Perkins "baited" him to quit his job by telling him, "you know what you need to do."  See Rodrigues SOF at ¶ 52; Rodrigues AMF at ¶¶ 64-65.

Fifteen days after his return from medical leave, on April 23, 2019, Rodrigues was fired.  Rodrigues SOF at ¶ 27; Unicorr SOF at ¶ 27.  At his termination meeting, Perkins told Rodrigues he was being fired because of the February 6 email chain.  Id.

B.    Procedural Background

Rodrigues has exhausted his administrative remedies by filing a timely Complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").  Second Am. Compl. at ¶ 14.  The CHRO issued a Release of Jurisdiction on December 13, 2019, and Rodrigues filed the instant action on March 3, 2020.  Id. at ¶ 16.

### III. LEGAL STANDARD

A motion for summary judgment may be granted only where the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

### IV. DISCUSSION

#### A. Counts One and Two: ADA and CFEPA Disability Discrimination

Unicorr seeks summary judgment as to Count One and Two of Rodrigues' Second Amended Complaint, sounding in disability discrimination under the ADA and the CFEPA.  See Mem. in Support of Mot. for Summary J. at 9-16.

Both ADA and CFEPA claims are analyzed under the McDonnell Douglas burden-shifting framework.  Preston v. Bristol Hosp., 645 F. App'x 17, 19 (2d

7

Cir. 2016). To prevail on his ADA and CFEPA discrimination claims, Rodrigues must first "establish a prima facie case" that he was discriminated against due to his disability. Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006). Once he has established a prima facie case, the burden shifts to the employer, Unicorr, to offer "a legitimate non-discriminatory reason for the discharge." Id. If the employer offers such a reason, "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Id.

        1.     Prima Facie Case

Rodrigues' first hurdle, establishing a prima facie case of discrimination, "is not a demanding burden." DeAngelo v. Yellowbook Inc., 105 F.Supp.3d 166, 174 (D. Conn. 2015) (internal quotations and citations omitted). To do so, "a plaintiff must show that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" Id. (quoting Sista, 445 F.3d at 169). He must show that disability discrimination was the but-for cause of the employment action. See Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019). Rodrigues' CFEPA claim is analyzed under this same framework. See DeAngelo, 105 F.Supp.3d at 180 ("[c]laims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in McDonnell Douglas"); see also Mancini v. Accredo Health Group, Inc., 411 F.Supp.3d 243, 255 (D. Conn. 2019) ("[s]ince whether [plaintiff] is disabled is not at issue here, the analysis of [her] CFEPA claim is the same as for the ADA claim").

Here, Unicorr does not contest that Rodrigues has satisfied the first three elements of his prima facie case. Unicorr argues only that Rodrigues cannot establish

8

the fourth element of his prima facie case, because he cannot show that he was discriminated against on the basis of his alleged disability. See Unicorr Mem. in Support of Mot. for Summary J. at 9. Rodrigues contends, though, that the temporal proximity between his April 23, 2019 termination and his medical leaves (March 18 to 21 and April 3 to 5, 2019) demonstrates that disability discrimination was the basis for his termination. See Opp'n at 13-14. As another court in this district has noted, evidence of temporal proximity between a medical emergency and termination blurs the line between evidence of intent to discriminate on the basis of disability and evidence of intent to retaliate for taking leave. See Mancini, 411 F. Supp. 3d at 251. Nonetheless, that court determined that termination soon after a plaintiff's medical emergency "is sufficient to establish a prima facie case of disability discrimination under the ADA." See id. (termination less than two weeks after a medical emergency established a prima facie case for the purposes of the court's analysis); see also Baron v. Advanced Asset and Property Management Solutions, LLC, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) ("courts in this circuit have held that the temporal proximity of an employee's disclosure of a disability to his termination support an inference of discrimination"); Trent v. Town of Brookhaven, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("temporal proximity may be sufficient to show a prima facie case").

      Here, the parties agree that Rodrigues was fired a mere fifteen days after returning from medical leave, and only five weeks after he testifies that he disclosed his prostate issues to Boyle. See Rodrigues SOF at ¶ 27; Unicorr SOF at ¶ 27; Rodrigues Depo. at 67. Viewing the facts in the light most favorable to Rodrigues, the non-movant, such temporal proximity could support an inference of discrimination by a reasonable

finder of fact.  See, e.g., Baron, 15 F. Supp. 3d at 283 (determining that temporal proximity supported an inference of discrimination where the plaintiff told his employer about a need for surgery five or six weeks before his termination).  Because a reasonable juror could infer that Unicorr discriminated against Rodrigues because of his disability, Rodrigues has established a prima facie case of discrimination.

    2.  Legitimate, Nondiscriminatory Reasons

Because Rodrigues has established a prima facie case, the burden shifts to Unicorr to proffer a legitimate, nondiscriminatory reason for terminating Rodrigues.  See Sista, 445 F.3d 161 at 169.  Unicorr has done so, pointing to Rodrigues' February 6, 2019 email chain with Clark in which he insulted his boss, Perkins.  See Mem. in Support of Mot. for Summary J. at 12; see also Ford v. Consol. Edison Co. of New York, No. 03 CIV. 9587 (PAC), 2006 WL 538116, at *11 (S.D.N.Y. Mar. 3, 2006), aff'd, 225 F. App'x 19 (2d Cir. 2007) ("unprofessional and insubordinate conduct in the workplace" constitutes a legitimate and nondiscriminatory reason for discipline).  Perkins also stated in his deposition that Rodrigues' performance weighed in his termination decision.  See Perkins Depo. at 57 (Doc. No. 34-5).  See Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate , non-discriminatory reason for the employer's adverse action.").  Thus, Unicorr has offered legitimate, nondiscriminatory reasons for Rodrigues' termination.

    3.  Pretext

Although Rodrigues has established a prima facie showing of discrimination based on his disability, he must also meet the higher burden to come forward with evidence to "demonstrate that [Unicorr's] assigned reasons[s]" for terminating his

10

employment "[were] a pretext or discriminatory in [their] application." Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807). A plaintiff's evidence at this step must be "viewed as a whole rather than in a piecemeal fashion." Walsh v. New York City Hous. Auth., 828 F.3d 70, 76 (2d Cir. 2016) (citing Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) ("[a] court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.")).

To make his case that Unicorr's reasons are merely pretextual, Rodrigues offers three pieces of evidence to demonstrate pretext: (1) Unicorr's "shifting rationales" for his termination; (2) Unicorr's failure to follow its own progressive discipline policy in terminating him; and (3) a "strong temporal connection" between his disclosure of his medical condition and his firing.

### a.     Shifting and Inconsistent Reasons

As for Rodrigues' first piece of evidence—Unicorr's shifting and inconsistent reasons for his termination—such inconsistency can constitute evidence that the employer's proffered reason is pretext for discrimination. See, e.g., Bourara v. New York Hotel Trades Council & Hotel Ass'n of New York City, Inc., Emp. Benefit Funds, No. 20-3092, 2021 WL 4851384, at *2 (2d Cir. Oct. 19, 2021) (citing Kwan v. Andalex Grp., LLC, 737 F.3d 834, 846 (2d Cir. 2013)). However, here as in Bourara, the record does not contain evidence upon which a reasonable juror could determine that Unicorr's proffered reasons shifted. See Bourara, 2021 WL 4851384, at *2 (determining that "at all relevant times, Defendant's reasons for terminating [Plaintiff] was based on" the same underlying event); cf. Kwan, 737 F.3d at 846 (concluding that a reasonable juror

11

could find pretext where an employer claimed that an employee was terminated because of the company's change in business focus, then the later claimed she was not terminated for that reason). Perkins undisputedly told Rodrigues that the February 6 email was the reason for his termination. See Rodrigues SOF at ¶ 27; Unicorr SOF at ¶ 27. Although Perkins mentioned during his deposition that Rodrigues' performance factored into the determination, the whole of Perkins' deposition testimony makes clear that he primarily asserted that the February 6 email motivated his decision to terminate Rodrigues, and only discussed Rodrigues' performance as an additional and less important contributing factor. See Perkins Depo. at 20-22; 42; 61; 63-65; 81; 89. Thus, a reasonable juror could not find Unicorr's reasons pretextual on the basis of a change in the proffered justification for Rodrigues' termination.

          b.        <u>Failure to Follow Internal Policies</u>

Rodrigues' second piece of evidence—Unicorr's failure to follow its own employee discipline policies—turns on genuine issues of material fact. The Second Circuit has held that "[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision." <u>Stern v. Trustees of Columbia Univ.</u> 131 F.3d 305, 313 (2d Cir. 1997) (internal citation omitted) (Title VII case); <u>Corona v. Clarins U.S.A., Inc.</u>, No. 17-CV-4438 (JGK), 2019 WL 4393082, at *8 (S.D.N.Y. Sept. 12, 2019) (holding that procedural irregularities in the termination process support an inference of pretext). Boyle testified that Unicorr applies a progressive disciplinary policy to its non-union employees, including Rodrigues. See Boyle Depo. at 77-78. Under the progressive disciplinary policy, he testified, an employee would be subject to increasingly harsh sanctions with each additional transgression, advancing from a verbal warning to a written warning to

suspension to termination.  Id.  He further explained that Unicorr follows this procedure without skipping a step unless an employee commits a "serious act" like acting violently or sleeping or drinking on the job.  Id. at 77-78.  In its Reply, Unicorr argues that later in his deposition, Boyle contradicted his earlier testimony, and stated that Unicorr did not regularly apply progressive discipline policies to employees like Rodrigues who are not covered by the union's collective bargaining agreement.  See Reply at 7-8 (Doc. No. 38) (citing Boyle Depo at 117-19).  However, pages 117 to 119 of Boyle's deposition are not in the record before the court.  See Unicorr's Excerpt of Boyle's Deposition (Doc. No. 30-7); Rodrigues' Excerpt of Boyle's Deposition (Doc. No. 34-3).  Even if these pages were in the record, the inconsistency in Boyle's testimony raises genuine issues of fact regarding the disciplinary process applicable to Rodrigues.  Whether a progressive disciplinary process such as Boyle described applied to Rodrigues is material, because, as Perkins testified, Rodrigues never received a negative performance review and was not warned in writing, suspended, or demoted before being terminated.  See Perkins Depo. at 46-47.  Thus, if such a disciplinary plan was in place at the time of Rodrigues' firing, a reasonable juror could find that Unicorr failed to follow it in terminating Rodrigues, leading to a reasonable inference of pretext.[1]

        c.        <u>Strong Temporal Proximity</u>

A reasonable juror could also find support for an inference of pretext on the basis of Rodrigues' third theory: the strong temporal connection between Rodrigues'

---

[1] The court notes that while Clark, the other author of the February 6 email chain, also appears to have been fired without progressive discipline, a reasonable juror could find the circumstances of his termination distinguishable from Rodrigues'.  Unicorr asserts that Clark had already tendered his resignation before the February 6 email chain, and that Perkins merely accepted it.  See Perkins Aff. at 11 (Doc. No. 30-3).  By contrast, neither party asserts that Rodrigues tendered his resignation at any point.

disclosure of his BPH and his termination.  The Second Circuit has made clear that, in the context of discrimination claims, "[t]he temporal proximity of events may give rise to an inference of [discrimination] for the purposes of establishing a prima facie case of [discrimination] under [the ADA], but <u>without more</u>, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." <u>Bourara</u>, 2021 WL 4851384, at *2 (emphasis added) (alterations in original).[2]  Here, though, Rodrigues offers more than just the short time frame between his disclosure of his BPH and his firing: he also points to Unicorr's alleged deviation from its standard termination practices, <u>see</u> pp. 12-13, <u>supra</u>, and draws the credibility of Unicorr's proffered reasons into question.

    Rodrigues identifies issues of fact as to whether Unicorr's claim that it fired him on the basis of the February 6 email is credible.  Perkins became aware of the disrespectful email chain on February 6, 2019 and terminated Clark, one of its authors, the next day.[3]  However, after speaking with Rodrigues on February 7, Perkins waited over two months until April 23—after Rodrigues' medical leaves—to terminate him.  Unicorr contends that Perkins and Boyle were too busy to terminate Rodrigues, <u>see</u> Reply at 5-6; however as Rodrigues points out, the three worked in the same North

---

[2] The cases that Rodrigues cites in support of his proposition that a strong temporal connection between his medical leave and his termination evidences pretext are inapposite here, as they concern retaliation claims, not discrimination claims.  <u>See</u> <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 180 (2d Cir. 2005) (strong temporal connection evidenced pretext where plaintiff's protected activity occurred one day before adverse retaliatory employment actions); <u>Khan v. HIP Centralized Lab'y Servs., Inc.</u>, No. CIVA CV03-2411(DGT), 2006 WL 842916, at *12 (E.D.N.Y. Mar. 27, 2006) (strong temporal evidence overcame nondiscriminatory reason when defendant took retaliatory action mere days after he filed a discrimination complaint); <u>see also</u> Rodrigues Opp'n at 16-17.

[3] As the court has noted, <u>see</u> p. 13 n. 1, <u>supra</u>, the circumstances of Clark's termination are in dispute, as Perkins stated that Clark had already tendered his resignation.  <u>See</u> Perkins Aff. at 11.  However, Boyle testified that Clark had "made his intention to resign known" but ultimately decided to stay at Unicorr before Perkins terminated him.  <u>See</u> Boyle Depo. at 34.

14

Haven plant, and Rodrigues' termination meeting ultimately was calendared for a short thirty-minute block. See Rodrigues Mem. at 17-18; Perkins Calendar (Doc. No. 34-21 at 3). Thus, issues of fact exist as to Unicorr's proffered reasons for delaying Rodrigues' termination for over two months after the email. Furthermore, issues of fact exist as to whether Perkins approved a five percent raise for Rodrigues on February 14, just over a week after he received Rodrigues' email and purportedly decided to terminate him. See Perkins Depo. at 49-50, 52 (Doc. No. 34-5). While Perkins undisputedly expressed doubts about whether Rodrigues deserved the raise, which was initially recommended by Rodrigues' prior manager, see Rodrigues SOF at ¶ 12; Unicorr SOF at ¶ 12; Perkins Feb. 5 Email (Doc. No. 30-3 at 8), and Unicorr argues that Perkins signed off on the raise on February 5 rather than February 14, see Reply at 6-7, issues of material fact exist as to whether Perkins approved the pay increase after he claims to have decided to let Rodrigues go. This kind of "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

     With regard to Rodrigues' performance, the testimony of both Perkins and Boyle also raises issues of material fact. It is undisputed that Rodrigues never received a poor performance review over the course of his near-thirty-year employment. See Perkins Depo. at 46-47. Perkins himself never gave Rodrigues feedback regarding his performance. Id. at 49-50. No one at Unicorr had complained of Rodrigues' underperformance at any point to Boyle or Perkins' knowledge. See Boyle Depo. at 38; Perkins Depo. at 57-58. Indeed, before stating that Rodrigues' performance made up

15

around "20, 30" percent of his decision to terminate Rodrigues, Perkins explained that he was "not a horrible or terrible employee. I think he was a good employee. I just think there were things he didn't get finished . . . It was a question of getting better, going beyond, that kind of stuff." Id. "[C]redibility determinations" to assess these conflicting portrayals of Rodrigues' job performance "are jury functions, not those of a judge." Corona v. Clarins U.S.A., Inc., No. 17-CV-4438 (JGK), 2019 WL 4393082, at *7 (S.D.N.Y. Sept. 12, 2019) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Given the close temporal proximity between Rodrigues' disclosure of his BPH and his termination, along with the issues of material fact that exist as to his performance and the process Unicorr followed in terminating him, a reasonable finder of fact could conclude that the February 6 email was not the reason for Rodrigues' termination, and that his BPH was more likely than not the but-for cause of his firing. Thus, the court denies summary judgment as to Counts One and Two.

### B. Count Three: FMLA Retaliation

Unicorr also moves for summary judgment as to Count Three of Rodrigues' Complaint, sounding in retaliation under the FMLA. Unicorr Mem. in Support of Mot. for Summary J. at 16-22. FMLA retaliation claims, like ADA and CFEPA claims, are analyzed under the familiar McDonnell Douglas burden-shifting rubric. Mancini, 411 F.Supp.3d at 256 (citing Roberts v. Health Ass'n, 308 F. App'x 568, 570 (2d Cir. 2009)).

#### 1. Prima Facie Case

Rodrigues has established a prima facie case of retaliation under the FMLA. "To make a prima facie showing of retaliation, [Rodrigues] must establish: (1) [he] exercised rights protected under the FMLA; (2) [he] was qualified for [his] position; (3) [he]

suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Id.  He must show only that his protected activity was a "motivating factor" in Unicorr's decision to terminate him.  Woods v. START Treatment & Recovery Centers, Inc., 864 F.3d 158, 166 (2d Cir. 2017).

Unicorr contests only the fourth prong of Rodrigues' prima facie case, arguing that he cannot show that he was fired under circumstances giving rise to an inference of retaliatory intent.  See Unicorr Mem. in Support of Mot. for Summary J. at 18-19.  However, Rodrigues has come forward with evidence that he informed Unicorr he was taking medical leave, took leave, and was fired shortly thereafter.[4]  The temporal proximity between his return from medical leave on April 8, 2019 and his termination on April 23, 2019, is enough to give rise to an inference of retaliatory intent.  See Fernandez v. Woodhull Med. & Mental Health Ctr., No. 14-CV-4191 (MKB), 2017 WL 3432037, at *8 (E.D.N.Y. Aug. 8, 2017) (collecting cases supporting the proposition that "courts frequently find a period of a few weeks sufficient to allow a jury to infer a causal connection between the protected act and the adverse employment action").

2. Legitimate, Nondiscriminatory Reasons

Because Rodrigues has made out a prima facie case, the burden shifts to Unicorr to offer legitimate, nondiscriminatory reasons.  As discussed above, Unicorr

---

[4] The parties' Statements of Facts appear to raise issues of fact as to whether Rodrigues properly requested FMLA leave in March and April, as well as whether Boyle followed his typical practice of providing information to employees requesting medical leave.  See Rodrigues SOF at ¶ 50; Unicorr SOF at ¶ 50.  However, Unicorr does not move for summary judgment on the ground that Rodrigues failed to exercise rights protected under the FMLA  or engage in a protected activity.

contends that it fired Rodrigues due to his February 6 email and performance, which constitute legitimate, nondiscriminatory reasons.  See p. 10, supra.

        3.    Pretext

            a.    <u>Temporal Proximity</u>

With respect to his FMLA claim, the temporal proximity of Rodrigues' termination and his medical leave, in combination with other record evidence, could lead a reasonable juror to an inference of pretext.  See <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 180 (2d Cir. 2005) (strong temporal connection evidenced pretext where plaintiff's protected activity occurred one day before adverse retaliatory employment actions) (Title VII case); <u>Khan v. HIP Centralized Lab'y Servs., Inc.</u>, No. CIVA CV03-2411(DGT), 2006 WL 842916, at *12 (E.D.N.Y. Mar. 27, 2006) (strong temporal evidence overcame nondiscriminatory reason when defendant took retaliatory action mere days after he filed a discrimination complaint) (Title VII case); see also <u>Donnelly v. Greenburgh Cent. Sch. Dist. No. 7</u>, 691 F.3d 134, 152 (2d Cir. 2012) (applying the Court's analysis of wrongful retaliation in Title VII cases to evaluate an FMLA retaliation claim).

Unicorr argues that temporal proximity cannot evidence pretext, because Perkins decided to terminate Rodrigues before the latter took his first medical leave on March 18, 2019.  See Unicorr Mem. in Support of Mot. for Summary J. at 19-20.  However, genuine issues of material fact exist as to the timing of Perkins' decision.  Perkins undisputedly wrote Boyle on February 6—the day of Rodrigues' critical email—that, with regards to the February 6 email, he was "thinking that this could be cause with no severance" to terminate Rodrigues.  See Perkins Feb. 6 Email (Doc. No. 30-5 at 9).  He also sent two emails on February 7 indicating his intent to let Rodrigues go.  See

Perkins Feb. 7 Emails (Doc. No. 30-5 at 18, 22).  Later the same day, though, Perkins emailed Boyle suggesting that he had not determined whether to terminate Rodrigues, saying, "[s]poke with [Rodrigues], haven't decided . . . ."  See Perkins Feb. 7 Email (Doc. No. 30-5 at 27).  Unicorr also points to a February 28, 2019 email from Boyle to Perkins asking whether he "want[ed] to take care of [Rodrigues] today", which Boyle testifies refers to processing Rodrigues' termination.  See Boyle Feb. 28 Email (Doc. No. 30-5 at 34); Boyle Depo. at 94 (Doc. No. 30-7).  However, the record contains no evidence as to whether Perkins responded to this email or intended to terminate Rodrigues at the time.

Moreover, Perkins' own testimony about his decision raises genuine issues of material fact about whether he resolved to terminate Rodrigues before his medical leaves.  Perkins stated that, on the day he received the email, he "needed to think about [terminating Rodrigues] a little more" and, while he was "pretty well decided" he was "maybe trying to figure out why [he] wouldn't."  Perkins Depo at 61.  He explained that, while he had "probably made the decision in [his] head", he "wanted to talk to some other people."  Id. at 63.  He said that on February 7, he "[h]adn't made a final decision, but [his] intent was always to fire [Rodrigues]."  Id. at 72.  No documents in the record evidence when Perkins' decision was made, id. at 73, and he does not recall when he made his final decision, although he maintains that he "never wavered" from his intent and spoke about it in undocumented phone calls. Id. at 73, 76.  The timing of Perkins' decision and the credibility of his inconsistent testimony regarding his choice are issues of material fact that lie within the province of the jury.  See Corona, 2019 WL 4393082, at *7.

19

Finally, temporal proximity does not stand alone as Rodrigues' only evidence of pretext.  As the court has discussed above in connection with Rodrigues' discrimination claim, he has also drawn the credibility of Unicorr's proffered reason for terminating him into question, see pp. 14-16, supra, and has identified issues of material fact with respect to whether Unicorr failed to follow its established termination process.  See pp. 12-13, supra. Accordingly, a reasonable juror could find that Unicorr's proffered reasons were pretextual and Rodrigues' medical leave was a motivating factor in Unicorr's decision to terminate him.  The court therefore denies Unicorr's Motion for Summary Judgment as to Count Three of Rodrigues' Second Amended Complaint.

## V.	CONCLUSION

For the foregoing reasons, Unicorr's Motion for Summary Judgment (Doc. No. 30) is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of March 2022.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge